UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
COVINGTON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| v. | ) | **AND ORDER** |
| | ) | |
| TERENCE DICKENS, | ) | Criminal Case No. 16-22-ART-CJS-01 |
| | ) | |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Defendant Terence Dickens is charged with one count of conspiracy to commit bank fraud and six counts of using the identification of another during and in relation to conspiracy to commit bank fraud. (R. 134). On August 22, 2016, Dickens filed a Motion to Suppress, arguing that the stop of his vehicle and his subsequent arrest violated his constitutional rights. (R. 96). After a change in counsel and time for new counsel to review the discovery, on November 18, 2016, Defendant's new counsel filed a Renewed Motion to Suppress, also challenging the traffic stop and arrest. (R. 173).

The Motions have been referred to the undersigned for consideration and preparation of a Report and Recommendation. (R. 9; 28 U.S.C. § 636(b)(1)(B)). On December 5, 2016, the Court held an evidentiary hearing on the Motions. (R. 182; R. 188). Dickens was present with counsel, David F. Fessler. The United States was represented by Assistant United States Attorney Laura K. Voorhees. At the hearing, the United States called Evendale Police Department Sergeant Sean McKinney. Dickens called no witnesses. At the conclusion of the hearing, the Court granted the parties' request to file post-hearing briefs. A transcript of the hearing and the parties' post-hearing

briefs having been filed (R. 188; R. 192; R. 194), the matter is now ripe for consideration. For the reasons set forth below, it will be recommended that Dickens's Motion to Suppress and Renewed Motion to Suppress (R. 96; R. 173) be **denied**.[1]

## I.    FACTUAL BACKGROUND

At the evidentiary hearing, Evendale Police Department Sergeant Sean McKinney testified that on December 21, 2015, he was approached by the Accounts Payable Clerk for the Village of Evendale, Ohio regarding a check she believed to be fraudulent, thus beginning the case investigation.[2] (R. 188, at 5-6). The check, which was originally made payable to Public Safety Health and Wellness for $11,510, had been altered substituting a Shellie Lynn Grubbs as the payee. (R. 188 at 6-7; R. 186, Exh. 1). The check was deposited into a Fifth Third Bank account in the name of Shellie Grubbs on December 12, 2015. (R. 188, at 7).

In the course of investigating the matter, Sergeant McKinney met with a Fifth Third Bank fraud investigator to examine the bank records of the account opened in Grubbs's name. (*Id*. at 8). Examination of the account revealed the deposit of the check from the Village of Evendale along with two other checks written for fairly substantial amounts. (*Id*.). Sergeant McKinney also reviewed numerous video clips and photographs of who, at the time, he determined to be Grubbs depositing the checks. (*Id*.). After this meeting, Sergeant McKinney sought and obtained a warrant for Grubbs's arrest on the charge of felony forgery. (*Id*.).

---

[1]Dickens also filed a Motion to Strike an exhibit attached to the Government's post-hearing brief because it was not offered as evidence during the evidentiary hearing. For the reasons discussed below, this Motion will be denied.

[2]In December 2015 McKinney was a Detective with the Evendale Police Department and has since been promoted to Sergeant.

Based on Sergeant McKinney's training and experience, he believed that Grubbs was just one member of a larger conspiracy. (*Id*. at 10). Sergeant McKinney explained that in his experience he has learned that the person who cashes or deposits the fraudulent checks is generally not the one receiving the majority of the funds. (*Id*.). Thus, he believed that because Grubbs's apparent role was that of a check-casher, she was not the one receiving the greatest benefit from the scheme. Instead, he believed it likely that she was merely receiving a portion of the funds in exchange for cashing the checks. (*Id*.).

Sergeant McKinney explained that after the warrant was issued, he attempted to contact Grubbs numerous times at the addresses and phone numbers she provided the bank when depositing the checks. (*Id*. at 8-9). Grubbs eventually returned Sergeant McKinney's phone calls. (*Id*. at 9). During this initial phone call, Grubbs informed Sergeant McKinney that "there's more to this than just her," confirming Sergeant McKinney's suspicion that she was just one member of a larger conspiracy. (*Id*. at 30-31). Grubbs agreed to turn herself in and to cooperate with law enforcement. (*Id*. at 9).

Grubbs met Sergeant McKinney and Evendale Police Officer Greg Titgemeyer at a Wendy's location in Cincinnati, Ohio, on December 29, 2015. (*Id*. at 9, 12). After speaking briefly with the officers at Wendy's, Grubbs was transported to the Evendale Police Department. (*Id*. at 9). Sergeant McKinney testified that while en route to the police department, Grubbs began giving the officers information regarding the fraudulent check scheme, including other checks she had cashed and/or deposited. (*Id*. at 9-10). Grubbs also identified three other individuals involved in the scheme: "Kevin T." or "K.T.," K.T.'s nephew, and a female named Vickie Lamb. (*Id*. at 10-11). From their conversation, the officers confirmed that Grubbs would cash the checks and give the money to K.T.,

3

who, in turn, would give her a portion of the funds in exchange for cashing the checks.  (*Id*. at 10, 31-32).  Grubbs also explained Vickie Lamb's role as assisting the operation by cashing, depositing, and altering checks.  (*Id*. at 10-11).

Upon arrival at the police department, the officers continued their conversation with Grubbs in an interview room.  (*Id*. at 11).  The conversation was video-recorded and played at the evidentiary hearing.  (R. 188, at 11, 17; R. 186, Exh. 2).  At the beginning of the recording, Sergeant McKinney asked Grubbs if K.T. had contacted her that day.  Grubbs responded that he had not, but her phone had been turned off.  Sergeant McKinney asked Grubbs to pull up K.T.'s number on her phone, which she did, informing the officers that K.T.'s number was 513-620-3681.  Grubbs explained that K.T. would usually call or text her when he wanted to get in touch with her, but she did not retain any text messages from him because he always made her delete them.  (R. 186, Exh. 2, at 12:27:00 - 12:28:21).

Sergeant McKinney questioned Grubbs about the number of fraudulent checks she had cashed and/or deposited in the last couple weeks.  Grubbs referenced one check she deposited in a Chase Bank account, and she showed Sergeant McKinney the mobile deposit on her phone.  (*Id*. at 12:28:27 - 12:29:29).  Sergeant McKinney testified that the deposit Grubbs showed him was for a check from Kennedy Welding in the amount of $1,798.  (R. 188, at 14).  He testified that the check had been deposited in Grubb's account with Chase Bank and was still pending at the time of the interview on December 29, 2015.  (*Id*.).

Sergeant McKinney asked Grubbs what banks she had "been to" in the last couple of weeks.  Grubbs responded that she had recently been to Chase Bank and PNC, but had also previously been to Fifth Third and U.S. Bank.  (R. 186, Exh. 2, at 12:31:20 - 12:32:10).  She explained that all of the

4

fraudulent checks she cashed and/or deposited were given to her from K.T. Grubbs explained that when she opened accounts at banks, K.T. would keep the debit cards connected to the accounts. She also stated that K.T. would make her use the debit cards on his behalf because he wanted to avoid being seen on camera. (*Id*. at 12:32:38 - 12:33:35). Grubbs explained that K.T. would monitor the accounts on her phone because he could not access the accounts from his phone due to security measures on the accounts. (*Id*. at 12:42:01 - 12:42:23).

Grubbs also informed the officers how the checks were obtained. Specifically, she confirmed that K.T. would steal checks from company mailboxes in the middle of the night. She stated that on one occasion, K.T. had directed her to try to steal checks from a company named BrewPro located near her grandmother's house but, unbeknownst to K.T., she did not make the attempt. Grubbs further confirmed that K.T. also had a contact at the post office who would steal checks from the mail. (*Id*. at 12:39:23 - 12:40:14).

Grubbs told the officers that once K.T. obtained the checks, he gave them to Vickie Lamb, who would then use a pen-like instrument with a razor tip to scrape off the names and addresses of the legitimate payees. Using a typewriter, Lamb would then insert either her own information or the information of one of her co-Defendants as the payee on the check. (*Id*. at 12:38:40 - 12:39:13). Grubbs explained K.T. was angry with Lamb because she recently "messed-up" a $10,000 check that he had given her to alter. (*Id*. at 12:29:50 - 12:30:36).

Grubbs admitted she had been involved in the check-cashing scheme for at least six months. She explained that she met K.T. at the McDonald's where she worked, and he offered to take her out to eat. During the meal, K.T. began talking about drugs and cashing checks. (*Id*. at 12:40:15 - 12:41:10). When asked how often K.T. frequented the McDonald's, Grubbs responded that he never

failed to show up every other Tuesday when she got paid to collect money she owed him for fronting her drugs.[3]  She further stated that K.T. would also pick her up at the McDonald's to take her to "withdraw the money."  (*Id*. at 12:41:27 - 12:42:01).

At one point during the interview, Grubbs asked if she could check her voicemail to see if she had a message from K.T.  Grubbs put her phone on speaker, and learned she had a new message from 513-620-3681–the number she claimed belonged to K.T.  However, when Grubbs tried to play the voicemail, it appeared K.T. had hung up before leaving a message.  (*Id*. at 12:42:50 - 12:43:40).

Sergeant McKinney asked Grubbs if she thought K.T. would meet with her that day and Grubbs responded that he probably would if she called him.  (*Id*. at 12:44:06 - 12:44:16).  She described K.T. as being approximately 35 to 36 years old, medium complected, with some facial hair.  (*Id*. at 12:33:50 - 12:33:59; R. 188, at 28).  She explained that K.T. drove a grey Chevrolet Tahoe with a Kentucky license plate and also told the officers that it was her understanding that K.T. had a check to give her that day with her name on it.  (*Id*. at 12:44:17 - 12:45:18).

While Grubbs was talking with the officers, she received a phone call from someone at 513-620-3681.  Grubbs answered the call and turned up the volume on her phone to allow the officers to hear the conversation.  During the phone call, K.T. accused Grubbs of stealing money from an individual named Vickie and claimed the money was his.  Grubbs repeatedly denied the accusation.  The two talked about Vickie overdosing in a bathroom while Grubbs was apparently present.  (*Id*. at 12:47:04 - 12:48:56).   The conversation soon turned to money that Grubbs owed K.T. and discussion of the clearing of a check or deposit in a "liquid" bank account.  Although parts of the

---

[3]Grubbs explained that although the day of the interview was a Tuesday, she got paid every two weeks and the day of her interview was not her pay day.

recorded phone call are inaudible, the following is the Court's assessment of the relevant portion of

the phone conversation between K.T. and Grubbs:[4]

> CALLER:    (Inaudible) . . . because apparently . . . (inaudible) . . . motherfucking ass, (inaudible) . . . I don't get my money.

> GRUBBS:    What money?

> CALLER:    Whatchu mean, "What money?" (Inaudible)

> GRUBBS:    You'll get it when I get paid.

> CALLER:    (Inaudible) . . . You holding my money for? . . . (inaudible).

> GRUBBS:    I know I owe you money.

> CALLER:    (Inaudible) . . . That shit cleared!

> GRUBBS:    No, it did not clear.

> CALLER:    Man, I don't know why they're holding it. But it's (inaudible), it's cleared. I don't know . . . (inaudible) . . . what the fuck is going on, but there ain't no reason in the world that ain't going to clear. It's from the same place as . . . (inaudible).

> *Grubbs turns on speakerphone*

> GRUBBS:    I don't understand why it hasn't cleared yet.

> CALLER:    It might be because of the holidays and they gave you a bullshit-ass Liquid Account.

---

[4] The Government attached a transcription of the video-recorded telephone conversation to its post-hearing brief. (R. 192-3). The transcription was not used or admitted as evidence at the suppression hearing. Dickens filed a Motion to Strike the transcription along with any reference to it contained in the Government's post-hearing brief, arguing that it is hearsay, unsworn testimony, and/or post-hearing testimony that was not subject to cross-examination or other constitutional or evidentiary safeguards. (R. 193). The Government filed a Response informing that the transcription was merely submitted as an aid to the Court. (R. 194).

In rendering this Report and Recommendation, the Court has carefully reviewed the audio recording presented at the hearing and did not rely on the transcription. Because the transcription was not considered as evidence nor used by the Court to assess what was said during the recorded phone call, Dickens's Motion to Strike will be denied.

GRUBBS:        That's probably it.

CALLER:        I don't know.  But I know I need to see you today so you can show me what's (inaudible) and how it's set up.  So where is you at?

GRUBBS:        That's fine I'm getting ready to get dropped off at my uncle's here in a few minutes.

CALLER:        Your uncle's, where?

GRUBBS:        On Reading Road, you know where I was staying at.

CALLER:        You're going back over there again?  I thought y'all fell out?

GRUBBS:        No, I need to go and speak to my uncle.

GRUBBS:        Hello?

CALLER:        Yeah, I'm listening.

GRUBBS:        I'll call you back in a few minutes, OK?

(*Id*. at 12:49:00 - 12:50:37).  After the conversation ended and Grubbs hung up the phone, she explained to the officers that K.T. kept insisting the deposit in the Chase Bank account had cleared, but it had not.  (*Id*. at 12:50:49 - 12:50:55).

Based on the information obtained through the interview, the officers began arranging a meeting between K.T. and Grubbs at the residence of Grubbs's uncle in order to identify K.T. Because K.T. had met Grubbs at her uncle's house in the past, Officer Titgemeyer asked Grubbs to describe how K.T. normally pulled in and parked his vehicle.  Grubbs explained that K.T. typically pulls in like he is going to BrewPro and then parks his vehicle facing Reading Road.  Sergeant McKinney told Grubbs they would have her call K.T. back in a couple of minutes to arrange the meeting.  Due to Grubbs's concern that K.T. would learn of her involvement with law enforcement,

Sergeant McKinney promised Grubbs that they would not let K.T. "get to" her.  (*Id*. at 12:51:02 - 12:51:38).

Sergeant McKinney testified that he, Officer Titgemeyer, and Grubbs drove in an unmarked minivan and parked at a gas station near the arranged meeting place where they could observe K.T. arrive in his vehicle.  (R. 188, at 18-19).  In the van, Grubbs again confirmed that K.T. drove a grey Chevrolet Tahoe and stated that it was a newer, 2015 model.  (*Id*. at 19-20).  At the direction of the Sergeant McKinney, Grubbs called K.T. and he informed her that he was on his way.  He also advised Grubbs that he had something for her, which Grubbs told the officers she believed to be a Wells Fargo check.  (*Id*. at 19).

Sergeant McKinney testified that after Grubbs made the phone call, they observed a newer model Tahoe approaching and Grubbs identified it, stating "that's the vehicle." (*Id*. at 19). Sergeant McKinney noted the vehicle matched the description Grubbs had previously provided, including the fact that it had a Kentucky license plate.  (*Id*. at 19-20).  Sergeant McKinney testified he was unable to see the occupants of the vehicle because the windows were too tinted.  (*Id*. at 20, 39).  Based on the positive identification of the vehicle, Sergeant McKinney testified that he radioed to a stationary police unit and requested the officer effectuate a stop "based on reasonable suspicion, if not probable cause, that [he] had developed at that point."  (*Id.* at 20).

Sergeant McKinney testified that the police officer stopped the vehicle at Sergeant McKinney's request and also because the officer observed the driver speeding as well as a window-tint violation.  (*Id*.).  Sergeant McKinney explained that the Tahoe pulled into the BrewPro parking lot just as Grubbs told them K.T. typically does.  (*Id*. at 42).  Once the stop occurred, Sergeant McKinney got out of the unmarked van and got into a marked police cruiser with Lieutenant Steve

9

Niehauser, who was also parked near the area. (*Id.* at 21). Officer Titgemeyer drove Grubbs back to the Evendale Police Department in the unmarked van. (*Id.*).

The officer who conducted the traffic stop approached the vehicle and asked for identification from the two occupants. (*Id.* at 21, 40-41). The officer brought the occupants' licenses to Sergeant McKinney, who was parked approximately thirty to forty yards away. (*Id.* at 41-42). Sergeant McKinney took a photograph of the two licenses on his phone and texted the image to one of the three officers present with Grubbs at the Evendale Police Department. The receiving officer showed Grubbs the image, and reported to Sergeant McKinney that Grubbs identified the driver, Terence Dickens, as K.T. and the passenger, William Dickens, as K.T.'s nephew. (*Id.* at 21-22, 42-43). Sergeant McKinney testified that, at that point, he believed he had probable cause to make an arrest and he arrested Terence Dickens for complicity to forgery. (*Id.* at 22, 43).

Sergeant McKinney testified that Dickens was searched at the time of his arrest and a cell phone was found on his person. (*Id.* at 22). William Dickens was also arrested and searched and a copy of a deposit in the name of Vickie Lamb was found in his pocket. (*Id.* at 37). A search warrant was obtained to search the vehicle. During the search, other phones were found. Of note, the phone that utilizes the phone number 513-620-3681 was found on the center console between the driver's and passenger's seats. (*Id.* at 22-23, 29). A warrant was obtained to search the cell phone. (*Id.* at 23).

Defendant Terence Dickens now challenges the stop of his vehicle, his arrest, and the seizure of his person. (R. 96; R. 173). Specifically, Defendant seeks suppression of all information/evidence

10

obtained after his arrest, including evidence found on his person, in the vehicle, and on the seized phones.[5]  (R. 190, at 8).

## II.    ANALYSIS

### A.    The stop of the vehicle was lawful.

Dickens seeks suppression of evidence based on an argument that the officers unlawfully stopped the vehicle he was driving.  However, as discussed below, all that is required for a lawful investigatory stop is that the officers have reasonable suspicion that an occupant in the vehicle is, or was, involved in criminal activity.  Here, the information the officers obtained from Grubbs provided particularized and objective facts sufficient to give rise to reasonable suspicion for the officers to stop the Tahoe in order to determine whether the driver was K.T.— the person the officers believed to be the leader of a fraudulent check-cashing scheme.  Reasonable suspicion having existed at the time of the stop, which is all that the law requires, the investigatory stop of the Tahoe was lawful, and Dickens's argument to the contrary fails.

The Fourth Amendment to the United States Constitution protects individuals against unreasonable searches and seizures.  U.S. Const. amend IV.  Fourth Amendment protection "'applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest.'"  *United States v. Noble*, 762 F.3d 509, 519 (6th Cir. 2014) (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975)).  This includes the brief detention commonly associated with a traffic stop; "the driver of the car is seized within the meaning of the Fourth Amendment." *Brendlin v. California*, 551 U.S. 249, 251 (2007).  In the context of traffic stops, Fourth Amendment jurisprudence provides that a traffic stop by law enforcement is lawful where the officer "possess[es]

---

[5]Dickens does not identify in his Motions what specific evidence he seeks to have suppressed.

either probable cause of a civil infraction or reasonable suspicion of criminal activity." *Noble,* 762 F.3d at 518 (quoting *United States v. Lyons,* 687 F.3d 754, 763 (6th Cir. 2012)).   The Supreme Court has held that, "consistent with the Fourth Amendment, police may stop persons in the absence of probable cause under limited circumstances." *United States v. Hensley*, 469 U.S. 221, 226 (1985) (citing *Dunaway v. New York*, 422 U.S. 200, 207-11 (1979); *Terry v. Ohio,* 392 U.S. 1 (1968)). Relevant here, law enforcement officers may briefly stop a vehicle to investigate a reasonable suspicion that its occupants are involved in criminal activity. *Brignoni-Ponce*, 422 U.S. at 881.[6]  In determining whether a reasonable suspicion exists, a reviewing court must consider the totality of the circumstances to determine whether the detaining officer has a "particularized and objective basis for suspecting legal wrongdoing."  *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

Defendant Terence Dickens appears to be arguing that the stop was illegal because the officers were not investigating an ongoing or imminent crime, but rather an alleged past crime.  (R. 190, at 8).  Despite Dickens's statement to the contrary, the crime the officers were investigating, complicity to forgery, appeared to be an ongoing crime.  While Grubbs provided officers with information regarding K.T.'s past involvement in the fraudulent scheme and certain completed transactions, she also told them that K.T. had a check to give her that day.  In addition, the participants in the scheme were still awaiting the clearing of a check, i.e. they had yet to receive the money.

---

[6]Notably, in the initial Motion to Suppress (R. 96), Dickens advances that probable cause is the required standard for initiating the stop of his vehicle, citing to *United States v. Ferguson*, 8 F.3d 385 (6th Cir. 1993).  However, as discussed above, only reasonable suspicion was needed for the stop here because officers were investigating suspected criminal activity involving Dickens.  The probable cause standard referenced in *Ferguson* pertained to a traffic stop for a civil infraction.  *Ferguson*, 8 F.3d at 391; *also see Lyons*, 687 F.3d at 763.

Moreover, even if the officers were investigating a past crime, the law does not limit *Terry* stops to investigations of ongoing crimes. While it may be true that *Terry* stops are more commonly conducted during investigations into ongoing or present criminal conduct, the Supreme Court has extended the holding of *Terry* to investigations of past crimes. *Hensley*, 469 U.S. at 227 (holding that an officer has the authority to make a *Terry* stop "when [he] has reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity") (quoting *United States v. Place*, 462 U.S. 696, 702 (1983)).

*Hensley* is the seminal case on this issue. In *Hensley*, an officer stopped an automobile based on information obtained from a "wanted flyer" indicating that Hensley was wanted for questioning in the investigation of an armed robbery that occurred nearly two weeks earlier. *Hensley*, 469 U.S. at 223-25. The department issuing the flyer had information from an informant that Hensley had driven the getaway car in the robbery, but the officers had been unable to locate Hensley for questioning. *Id.* at 223. The Supreme Court reasoned that in circumstances "where police have been unable to locate a person suspected of involvement in a past crime, the ability to briefly stop that person, ask questions, or check identification in the absence of probable cause promotes the strong government interest in solving crimes and bringing offenders to justice." *Id.* at 229.

Interestingly, Dickens relies on *Hensley* as support for his challenge that the stop was unlawful because officers were investigating a completed crime. (R. 190, at 8). Dickens quotes a portion of *Hensley* wherein the Supreme Court weighs the different public interests served by traffic stops to investigate ongoing crimes versus traffic stops to investigate completed crimes. However, he ignores the Supreme Court's holding that "[i]t is enough to say that, if police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in

13

or is wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion." *Hensley,* 469 U.S. at 229.  Here, the evidence presented at the evidentiary hearing demonstrates that the officers had a reasonable suspicion grounded in articulable facts, provided by Grubbs, that the driver of the Tahoe was the person known to Grubbs as K.T., whom Grubbs had described as having a role in the fraudulent check-cashing scheme consistent with that of a leader.

Sergeant McKinney testified that before he spoke to Grubbs, he believed, based on his training and experience, that Grubbs was part of a larger conspiracy.  Upon making contact with Grubbs, she confirmed his suspicion that more people were involved in the fraudulent scheme, and she agreed to turn herself in and cooperate with the officers.  While the officers were transporting Grubbs and during her recorded interview at the station, Grubbs provided detailed information about the fraudulent check-cashing scheme, including the names and roles of her co-conspirators, how she first met K.T., and how she became involved in the conspiracy.  She also explained how K.T. obtained the fraudulent checks and how the checks were altered by Vickie Lamb.  She spoke openly about her own role in the scheme, identifying the banks at which she cashed and/or deposited the fraudulent checks and allowed the officers to view a mobile deposit of a fraudulent check on her phone.  Grubbs did not attempt to minimize her culpability and even implicated herself in conduct beyond what was known to the officers.

Moreover, the information provided by Grubbs was continually corroborated during the course of the interview.  When K.T. called Grubbs's cell phone, he called from the same phone number that Grubbs had previously provided to the officers as belonging to K.T.  He also made statements during that call that were consistent with information Grubbs had disclosed about the fraudulent scheme.  Specifically, throughout the conversation, K.T. aggressively demanded money

14

from Grubbs and made reference to a check or deposit in a bank account that had not yet cleared. K.T. was angry about the deposit's pending status and suggested that maybe it had not yet cleared due to the holidays or because Grubbs was given a "bullshit-ass liquid account."  (R. 186, Exh. 2, at 12:49:45 - 12:49:55).  These facts corroborated Grubbs's statements to the officers about the fraudulent check she had recently deposited in her Chase Bank account that was still pending.

In addition to the corroborating evidence obtained during the interview, the events that transpired immediately prior to the stop also corroborated Grubbs's information.  After Grubbs and the officers arrived near the prearranged location, they had Grubbs call K.T., and he told her he was on his way.  Shortly thereafter, a 2015 grey Chevrolet Tahoe with a Kentucky license plate arrived at the location where Grubbs had arranged to meet K.T.  The vehicle matched the description Grubbs provided to the officers and she specifically identified the vehicle to the officers upon sight as belonging to K.T.  The vehicle also entered the parking lot and parked in the same manner that Grubbs had described was K.T.'s typical practice when he met her at that location.  All of these facts are consistent with the information Grubbs had provided to the officers and enhanced her credibility.

Thus, review of the circumstances in this case demonstrates the officers had a particularized and objective basis for suspecting that the driver of the Tahoe was involved in the fraudulent check-cashing scheme.  Therefore, under *Hensley*, the officers' decision to conduct an investigatory stop of the Tahoe was based on reasonable suspicion and was lawful.

The Sixth Circuit has applied *Hensley* under analogous circumstances and held the investigatory stops of vehicles were lawful.  *See United States v. Marxen*, 410 F.3d 326 (6th Cir. 2005) (holding an investigatory stop of a vehicle was lawful as supported by reasonable suspicion where, eleven days after the robbery, officers stopped the suspected getaway car based on witnesses'

descriptions of its make, model, color and probable license number, despite the fact the driver did not fit the description of either of the two robbers); *United States v Townsend*, 330 F.3d 438 (6th Cir. 2003) (upholding *Terry* stop of a vehicle, finding the officers had reasonable suspicion to stop a car to investigate whether its driver was involved in manufacturing methamphetamine based on a tip from a Wal-Mart employee that an individual driving a white Chevrolet Blazer with a specific tag number had just purchased a large amount of methamphetamine precursor).   Notably, in both *Marxen* and *Townsend,* the officers received a tip describing the vehicle in which the individual sought may be found.   In both cases, the Sixth Circuit held this information, combined with other information known to officers, was sufficient to provide reasonable suspicion to justify the stop.

Similarly here, the information provided the officers by Grubbs sufficiently described the make, model, year and color of the vehicle she knew K.T. to drive.   In addition, she told the officers that the vehicle would have a Kentucky license plate.   While the specific license plate number may not have been provided, a vehicle matching the description Grubbs provided arrived at the prearranged location at the anticipated time.   Further, Grubbs accompanied the officers to the prearranged location, and Grubbs specifically identified K.T.'s vehicle, stating "that's the vehicle." (R. 188, at 19).   As in *Marxen* and *Townsend*, the stop was based on reasonable suspicion and thus lawful.

The Government argues that Dickens's vehicle was also properly stopped based upon the fact that the police officer making the stop had observed him speeding and also noted the vehicle had a window-tint violation.  (R. 109, at 4, 7).  While the Court notes the traffic violations are yet another lawful reason for stopping the vehicle, it need not discuss them further because regardless of the

traffic violations, the officers had reasonable suspicion to stop the vehicle to investigate whether the person known to Grubbs as K.T. was located in the vehicle.

In Dickens's post-hearing brief, he emphasizes certain facts, apparently in an attempt to demonstrate that the officers did not have a reasonable suspicion to stop his vehicle. Specifically, Dickens alleges that Grubbs provided a description of the Tahoe that would fit many vehicles on the road and that the window tint precluded the officers from seeing the occupants prior to effectuating the traffic stop. However, these contentions do not negate that a vehicle matching Grubbs's description arrived at the preplanned location at the arranged time, and that Grubbs told the officers "that's the vehicle." Dickens also points out that Grubbs informed the officers at the interview that she did not have any texts from K.T. on her phone, apparently to support that Dickens was not involved in any fraudulent checks. However, during the interview, Grubbs explained that she did not have any texts from K.T. on her phone because he always made her delete them. Dickens fails to recognize that all that is required to effectuate a lawful stop is reasonable suspicion–nothing more. The information Grubbs provided the officers, in addition to the corroborating events, provided the officers with such reasonable suspicion to effectuate the traffic stop of the Tahoe.

Finally, Dickens also makes several factual arguments that are not pertinent to this Fourth Amendment analysis. Specifically, Dickens argues the conversation the officers overheard between K.T. and Grubbs was in reference to Grubbs's paycheck, not a forged check. Dickens also argues the information Grubbs provided to the officers demonstrated she knew too much to be merely a check-casher. Dickens argues that the level of Grubbs's knowledge of the scheme indicates that she

was the leader and is trying to "hang it" on K.T.[7]  The question presented at this stage of the case, however, is only whether the officers had a reasonable suspicion to conduct an investigatory stop of the vehicle.  While Dickens's factual disputes may prove relevant to the jury's assessment of the case merits, they do not undermine the information Grubbs gave the officers that provided them with reasonable suspicion that K.T. was involved in the fraudulent check-cashing scheme.

Accordingly, the evidence presented at the evidentiary hearing demonstrates that the investigatory stop of the Tahoe was based on the officers' reasonable suspicion that K.T., a person believed to be involved in a fraudulent check-cashing scheme, would be located therein.  The law requires no more for the stop to be found lawful.  Accordingly, Dickens's argument that his Fourth Amendment rights were violated by the stop lacks merit.

---

[7]Besides being irrelevant to his suppression motion, Dickens's contentions are also not convincing. He argues that the check referenced in the phone call was actually Grubbs's paycheck but does not explain how there would be concerns for a paycheck at that time "clearing."  Grubbs worked at a McDonalds, and her last pay day was a week earlier.  At the time the officers were listening to the conversation between Grubbs and K.T., they were aware of the fraudulent Kennedy Welding check that was pending in Grubbs's Chase Bank account.  Sergeant McKinney testified at the suppression hearing that he was also aware that a liquid account was a reloadable form of a bank account with Chase Bank.  (R. 188, at 15).  Further, K.T. made a request to meet with Grubbs that day so he could see how "it's set up."  Although K.T. does not specifically state that he wanted to see how the Chase Bank account was set up, this would be a reasonable inference given Grubbs had disclosed to the officers that K.T. often viewed the bank accounts on her cell phone because he was unable to access the accounts on his phone.  It was reasonable for the officers to believe the conversation they were listening to was corroboration of the information Grubbs provided regarding the fraudulent check scheme.

As to Dickens's allegation that Grubbs was trying to "hang" the fraudulent scheme on him, as discussed above, Grubbs openly implicated herself in criminal conduct, providing the officers with information of her own culpability in the fraudulent check-cashing scheme.  There was no indication that Grubbs was attempting to minimize her role in the conspiracy or had any intention of "hanging" the blame on others.  Further, K.T.'s aggressive and demanding demeanor during the phone conversation overheard by the officers corroborated Grubbs's contention that K.T. was the one in control.  Finally, Grubbs described the different roles assumed by her co-conspirators in detail and came across as a reliable source.

**B.      The arrest of Dickens was lawful.**

Dickens also seeks suppression of evidence obtained upon or after his arrest on December 29, 2015, arguing the officers lacked probable cause to arrest him.   The evidence at the evidentiary hearing, however, demonstrates otherwise.   As discussed below, at the time the officers arrested Dickens, they had knowledge of sufficient facts and circumstances, based on reasonably trustworthy information, for them to believe that Dickens was involved in the fraudulent check-cashing scheme and thus the arrest was lawful.

It is well established that an officer may make a warrantless arrest if he has probable cause to believe that the person to be arrested has committed an offense.   *United States v. Romero*, 452 F.3d 610, 615 (6th Cir. 2006) ("It is a well-settled principle of constitutional jurisprudence that an arrest without probable cause constitutes an unreasonable seizure in violation of the Fourth Amendment.") (quoting *Ingram v. City of Columbus*, 185 F.3d 579, 592-93 (6th Cir. 1999)).   The Sixth Circuit has explained:

> In order to determine whether or not appellees' arrests were supported by probable cause, we must determine whether "at that moment the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent [person] in believing that [appellees] had committed or [were] committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91, 85 S. Ct. 223, 13 L. Ed.2d 142 (1964).   "To determine whether an officer had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371, 124 S. Ct. 795, 157 L .Ed.2d 769 (2003) (quoting *Ornelas v. United States*, 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996)).

> "The substance of all the definitions of probable cause is a reasonable ground for belief of guilt." *Brinegar v. United States*, 338 U.S. 160, 175, 69 S. Ct. 1302, 93 L. Ed. 1879 (1949) (internal quotation marks omitted).   "[A] reviewing court is to take into account the 'factual and practical considerations of everyday life' that would

19

lead a reasonable person to determine that there is a reasonable probability that illegality has occurred or is about to occur." *United States v. Strickland*, 144 F.3d 412, 415 (6th Cir. 1998) (quoting *Illinois v. Gates*, 462 U.S. 213, 231, 103 S. Ct. 2317, 76 L. Ed.2d 527 (1983)).  When determining whether an arrest was supported by probable cause, we utilize a "totality-of-the-circumstances approach." *United States v. Pelham*, 801 F.2d 875, 877 (6th Cir. 1986), *cert. denied*, 479 U.S. 1092, 107 S. Ct. 1305, 94 L. Ed.2d 160 (1987) (quoting *Gates*, 462 U.S. at 230–31, 103 S. Ct. 2317). While probable cause means that "officers must show more than mere suspicion, the probable cause requirement does not require that they possess evidence sufficient to establish a prima facie case at trial, much less evidence sufficient to establish guilt beyond a reasonable doubt." *Strickland*, 144 F.3d at 416.  However, "[t]he belief of guilt must be particularized with respect to the person to be searched or seized." *Pringle*, 540 U.S. at 371, 124 S. Ct. 795 (citing *Ybarra v. Illinois*, 444 U.S. 85, 91, 100 S. Ct. 338, 62 L. Ed.2d 238 (1979)).

*Romero*, 452 F.3d at 615-16.

In addition, probable cause can be based on information from an informant.  *United States v. Cooper*, 1 F. App'x 399, 403 (6th Cir. 2001) ("an informant's tip, by itself, can suffice to create probable cause if the tip appears reliable under the totality of the circumstances") (citing *Illinois v. Gates*, 462 U.S. 213, 230 (1983)).  In addition, "[u]nlike a tip from an anonymous informant, a 'tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated' is far more trustworthy."  *United States v. Tillman*, 404 F. App'x 949, 952 (6th Cir. 2010) (quoting *Florida v. J.L*, 529 U.S. 266, 270 (2000)).

Here, as discussed above, prior to the stop of the Tahoe, Grubbs had provided the officers with a great deal of information about the fraudulent check-cashing scheme.  She informed the officers of how the checks were obtained, altered and cashed/deposited.  She specifically explained K.T.'s involvement in the scheme, including the fact he stole the checks from company mailboxes, gave them to Vickie Lamb to alter, and then gave the checks made payable to Grubbs to her to cash

20

and/or deposit.  Grubbs also explained K.T. received the bulk of the money, and she detailed how he monitored and controlled the accounts set up in her name.

The officers found Grubbs's statements to be credible for several reasons. (R. 188, at 10-15). First, she was very cooperative, implicating herself in the fraudulent scheme in addition to her co-conspirators, and provided information on other false checks of which the officers were unaware. Second, during the officers' interview of Grubbs, K.T. called Grubbs's cell phone from a phone with the same phone number Grubbs had previously told officers belonged to K.T.  Further, during the phone call, K.T. was heard talking about his frustration with a check not clearing and insisting he needed to meet with Grubbs to see how "it's set up" which Sergeant McKinney reasonably construed as a request to review Grubbs's Chase account–the account holding the pending fraudulent check that Sergeant McKinney had previously viewed on Grubbs's cell phone.  (R. 188, at 10-15; 48-49).

The officers were missing a critical link; they did not know the identity of K.T.  The officers were able to connect this link with Grubbs's assistance.  After stopping the vehicle Grubbs identified as belonging to K.T., Grubbs positively identified the image on Dickens's driver's license as being that of K.T.  Considering the totality of the circumstances, including Grubbs's positive identification that Dickens is, in fact, the person she knew as K.T., the officers had probable cause to arrest him for his involvement in the fraudulent check-cashing scheme.  That is, the officers had sufficient knowledge of facts and circumstances based on reasonably trustworthy information from Grubbs sufficient to warrant a prudent person to believe that Dickens was K.T., the person believed to be the leader of the fraudulent check-cashing scheme.  Thus, probable cause existed for the officers to arrest Dickens.

21

Dickens finds it significant that Sergeant McKinney testified that, after his interview with Grubbs, he felt he had probable cause to continue the investigation and planned to make a traffic stop to investigate further, but he did not indicate he had any intention of arresting K.T. or that he thought he had probable cause to arrest him. (R. 190, at 5). However, Sergeant McKinney did testify that he thought the corroboration of the phone call K.T. made to Grubbs during their interview provided probable cause to arrest. (R. 188, at 46).

Dickens also seems to suggest that probable cause did not exist to arrest him because the search of his person and of the Tahoe did not reveal any checks or debit cards. Nor was the phone utilizing the number the officers believed belonged to K.T., 513-620-3681, found on his person. Instead, this phone was found during the search of the car on the center console between the driver's and passenger's seats. While these facts may ultimately persuade a trier of fact against a finding of guilt beyond a reasonable doubt, they are not relevant to the determination of whether the officers had probable cause to arrest Dickens on the day in question. This is because "probable cause is assessed from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight, and thus probable cause determinations involve an examination of [only] facts and circumstances within an officer's knowledge at the time of an arrest." *United States v. Martin*, 289 F.3d 392, 400-01 (6th Cir. 2002) (quoting *Klein v. Long*, 275 F.3d 544, 550 (6th Cir. 2001)). Here, what the officers may or may not have found during a subsequent search is not indicative as to what the officer knew at the time of the arrest and thus does not factor into the analysis of whether the officers had probable cause to arrest Dickens.

Nor does Dickens's argument that the officers inappropriately prolonged the stop have merit. Dickens argues that he was pulled over, in part, because of alleged speeding and window tint

22

violations. (R. 190, at 7). He states that under the guise of the traffic stop, the officer requested identification from both the driver and the passenger of the vehicle and then "took unusual steps with those identifications to promote another investigation," which unlawfully prolonged the stop. (R. 190, at 7). In support of his argument, Dickens cites to *Rodriguez v. United States*, 135 S. Ct. 1609 (2015) and *United States v. Evans*, 786 F.3d 779, 786 (9th Cir. 2015). However, neither *Rodriguez* nor *Evans* are on point.

In both *Rodriguez* and *Evans*, the police officers initiated traffic stops only on the basis that the officers had observed traffic violations. *Rodriguez*, 135 S. Ct. at 1612; *Evans*, 786 F.3d at 782. In *Rodriguez*, after the officer had completed the tasks associated with the traffic stop, he conducted a dog sniff on the vehicle. *Rodriguez*, 135 S. Ct. at 1613. The dog alerted to the presence of drugs and a search of the vehicle revealed methamphetamine. *Id*. The defendant sought to suppress the drugs, arguing the officer had unreasonably prolonged the stop without a reasonable suspicion of illegality. *Id*. The Supreme Court held that "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures. A seizure justified only by a police-observed traffic violation, therefore, 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." *Id.* at 1612 (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). Since the traffic stop in *Rodriguez* had concluded prior to the dog sniff, the Supreme Court concluded the officer's further detention of the defendant for purposes of the dog sniff had unreasonably prolonged the stop in violation of the defendant's Fourth Amendment rights. *Id*.

In *Evans*, the court held that the officer's decision to conduct an ex-felon registration check, which was wholly unrelated to the traffic violation for which Evans was stopped, prolonged the

23

traffic stop beyond the time reasonably required to complete his traffic "mission." *Evans*, 786 F.3d at 786. Thus, the court found the officer inappropriately prolonged the traffic stop in violation of the defendant's Fourth Amendment rights. *Id.*

The situation at hand is not analogous to that of *Rodriguez* or *Evans*. The stop in this case was not solely initiated on the basis of a police-observed traffic violation. Instead, the primary reason for which the stop was made was to identify the occupants of the grey Chevrolet Tahoe to determine if the individual Grubbs knew as K.T. was present. There are no facts in the record demonstrating that the duration of the stop was longer than necessary to effectuate this purpose. *United States v. Everett*, 601 F.3d 484, 488 (6th Cir. 2010) (citing *Florida v. Royer*, 460 U.S. 491, 500 (1983)).

The evidence at the evidentiary hearing demonstrates the officers had a reasonable suspicion to stop Dickens's vehicle. That reasonable suspicion, upon the identification of Dickens as K.T., ripened into probable cause for his arrest. Thus, Dickens's constitutional rights were not violated by either the stop or arrest, and his Motion to Suppress and Renewed Motion to Suppress should be denied.

**III.    CONCLUSION**

For the reasons stated herein,

**IT IS ORDERED** that Defendant Terence Dickens's Motion to Strike (R. 193) is **denied as moot.**

**IT IS RECOMMENDED** that Defendant's Motion to Suppress and Renewed Motion to Suppress (R. 96; R. 173) be **denied.**

Specific objections to this Report and Recommendation must be filed within **fourteen (14) days** of the date of service or further appeal is waived.  28 U.S.C. § 636(b)(1)(C); Fed. R. Crim. P. 59(b)(2); *Thomas v. Arn*, 728 F.2d 813, 815 (6th Cir. 1984), *aff'd*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Dated this 5th day of January, 2017.



**Signed By:**

***Candace J. Smith***

**United States Magistrate Judge**

J:\DATA\Orders\criminal cov\2016\16-22-ART-CJS-1 mtn to suppress.final.wpd

25